UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **JESUS M. CARABALLO,**<br>**Plaintiff,**<br>v.<br>**COMMISSIONER OF SOCIAL SECURITY,**<br>**Defendant.** | Civ. No. 2:13-cv-07187 (KM)<br><br>OPINION |

**McNulty, U.S.D.J.:**

    Jesus M. Caraballo has applied for disability benefits under the Social Security Act ("SSA"). It is undisputed that he suffers from depression, but the medical evidence is in conflict as to its severity. A psychologist evaluating Mr. Caraballo for the Social Security Administration diagnosed Mr. Caraballo as suffering from "recurrent major depression, severe, with some psychotic features," and "[g]eneralized anxiety disorder, severe." (Perdomo Evaluation,[1]

---

[1] Citations to the record will be abbreviated as follows:

"August 2010 Disability Report" – "Disability Report – Appeal," No. 8-6, Exh. 9E, 224-231.
"Britton Psychiatric Report" – Psychiatric Review Technique, completed by Michael Britton, Ed.D, No. 8-7, 287-300.
"Britton RFC Assessment – Mental Residual Functional Capacity Assessment, completed by Michael Britton, Ed.D, No. 8-7, 301-304.
"Caraballo Testimony" – Transcript, Hearing Held June 8, 2011, No. 8-2, 38-55.
"Decision" – Office of Disability Adjudication and Review Decision, No. 8-2, 15-23.
"Function Report" – Function Report – Adult, No. 8-6, 192-199.
"Opp." – Defendant's Brief Pursuant to Local Rule 9.1, No. 12.

1

4). Records from the hospital where Mr. Caraballo received treatment, however, describe his condition as "mild depression" or "mild anxiety." (Trinitas Treatment Records I, 9-11; Trinitas Treatment Records II, 8-12, 15). An Administrative Law Judge reviewed Mr. Caraballo's medical records and heard testimony from Mr. Caraballo. Reviewing all the evidence and stating her reasons for giving greater or lesser weight to different items, the ALJ concluded that Mr. Caraballo was not disabled. Because those findings are supported by substantial evidence, this Court will affirm the decision of the ALJ.

## I. Background

The regulations that govern disability determinations recognize that severe depression can make it prohibitively difficult for an individual to work. Claims of disability based on mental impairments are subject to the same five-step inquiry that applies to other types of disability. *See* 20 C.F.R. § 404.1520(a)(4).

Briefly, that five step inquiry proceeds as follows. The claimant must first demonstrate that he[2] is not currently engaged in "substantial gainful activity," *i.e.*, that he is not currently working. 20 C.F.R. § 404.1520(a)(4)(i). At Step 2, the claimant must demonstrate that he has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the claimant must demonstrate that his impairment meets or is equal to the

---

"Pena Opinion" – Medical Report on Adult with Allegation of HIV Infection, dated 02/01/2012 from Dr. Jesus Pena/Trinitas/Dept. of Behavioral Health & Psy, No. 8-7, Exh. 14F, 361.
"Perdomo Evaluation" - Psychological Evaluation by Dr. Erensto L. Perdomo, No. 8-7, 249-253.
"Plaintiff's Brief" – Brief In Support of Plaintiff Jesus M. Caraballo, No. 11.
"Trinitas Treatment Records I" – Outpatient Treatment Records dated 10/15/2008 to 3/10/2010, No. 8-7, Exh 4F, 254-284.
"Trinitas Treatment Records II" – Outpatient Hospital Records dated 03/01/2010 to 08/17/2011 from Trinitas Hospital Department of Behavioral Health and Psychiatry, No. 8-7, Exh. 11F, 330-352.
"Vocational Expert Testimony" – Transcript, Hearing Held March 12, 2012, No. 8-2, 28-37.
[2] Mr. Caraballo is male, and for convenience this opinion will use the male pronoun when referring to an applicant for disability benefits.

impairments listed in an Appendix to the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals one of the listed impairments, the claimant is presumed disabled, and the inquiry ends. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Meyler v. Comm'r of Soc. Sec.*, 238 F. App'x 884, 888-89 (3d Cir. 2007), *as amended* (Aug. 29, 2007). After step three, but before step four, the Commissioner determines the claimant's "residual functional capacity," meaning "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner then uses this determination at step 4 to decide whether the claimant can return to his prior occupation. 20 C.F.R. § 1520(a)(4)(iv). If the claimant cannot do so, at Step 5 the Commissioner determines whether the claimant can perform some other form of work available in the national economy. 20 C.F.R. § 1520(a)(4)(v).

In this case, the Commissioner completed all five steps of the evaluation process and found that Mr. Caraballo was not disabled. The ALJ found that Mr. Caraballo was not engaged in gainful activity, and that he suffered from "affective disorders," a type of mental impairment. (Decision, 3). However, the ALJ decided that the severity of those impairments did not meet or equal one of the impairments listed in the regulations. Specifically, she found that Mr. Caraballo was not "markedly" restricted in his activities of daily living, social functioning, or in concentration, persistence, or pace. (Decision, 4). Having so found, the ALJ determined his residual functional capacity. She then determined that he could not return to his previous work as a truck driver, but that there was work available in the national economy that he could perform. (Decision, 5-9).

Mr. Caraballo challenges the ALJ's decision on four grounds: (1) At Step 3, the ALJ should have determined that Mr. Caraballo's impairments did meet one of the listed impairments in the regulations; (2) Also at Step 3, the ALJ should have more specifically diagnosed Mr. Caraballo's impairments; (3) That following Step 3, the ALJ improperly assessed Mr. Caraballo's residual functional capacity; and (4) at Step 5, the ALJ relied on the wrong portion of a

vocational expert's testimony in determining that there were available jobs Mr. Caraballo could do.

Congress conferred jurisdiction on district courts to review the disability determinations of the Commissioner at 42 U.S.C. § 405(g). This Court's review is limited. Although legal issues are reviewed *de novo*, with respect to questions of fact the Court must affirm the Commissioner's decision if that decision is supported by "substantial evidence." *See* 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); *Morrison ex rel. Morrison v. Comm'r of Soc. Sec.*, 268 F. App'x 186, 187 (3d Cir. 2008). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate... Where substantial evidence in the record supports the Commissioner's findings, the reviewing court must uphold his decision "even if [it] would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 35 (3d Cir. 2001) (internal quotations and citations omitted).

## II. Discussion

### A. Step Three

The ALJ found that Mr. Caraballo met steps 1 and 2. As to those determinations there is no dispute.

Mr. Caraballo's first claim of error arises from the ALJ's findings at Step 3. At that step, the claimant must demonstrate that his impairment is severe enough to meet or equal one of the impairments listed in the Regulations. 20 C.F.R. § 404.1520(a)(4)(iii). The list is found at Appendix 1 to Part 404, Subpart P of the Regulations. For mental impairments like the ones alleged here, Appendix 1 contains three lists of disorders, contained in Paragraphs A, B, and C. To satisfy step 3, the claimant must meet either: (1) the requirements of Paragraph A *and* the requirements of Paragraph B; *or* (2) the requirements of Paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. As to the first alternative, the ALJ bypassed Paragraph A and focused on Paragraph B.

4

Paragraph B requires that the claimant's impairment include at least two of the following four conditions:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ found that Mr. Caraballo had a degree of restriction in the first three areas. But because those restrictions were only "moderate," and not "marked" as required, the ALJ concluded that Mr. Caraballo's condition did not qualify.

Mr. Caraballo challenges the ALJ's decision that he is only moderately impaired in the areas of social functioning, activities of daily living, and mental concentration.

### 1. Criteria 1 and 2: Activities of daily living and social functioning

With respect to activities of daily living, the regulations provide:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. Part 404 Subpart P, App. I, § 12.00(C)(1).

With respect to social functioning the regulations provide:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other

5

> individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities."

20 C.F.R. Part 404 Subpart P, App. I, § 12.00(C)(1).

Because the evidence of these two criteria overlaps, I discuss them together. To be sure, Mr. Caraballo reported that he had significant problems in activities of daily living and in social functioning. Mr. Caraballo stated or testified that he spends his days in his room, pacing, sitting, or thinking. (Perdomo Evaluation, 1; Caraballo Testimony, 8). He reported that he does not prepare his own meals, does no household chores, does no shopping, does not pay bills, and that his only hobby is watching TV. (Function Report, 3-4). He reported that he does not outside of his home (for example, he does not go to church, social groups, or community centers. (Function Report, 5)). His travels only when his wife accompanies him, never alone, and he is afraid to drive. (Function Report, 3-4). When asked whether he has problems "getting along with family," Mr. Caraballo checked the box for "Yes," and explained that he "feels aggravated by little details that happens around the house." (Function Report, 5). When asked whether he spends time with others "[i]n person, on the phone, on the computer, etc.), Mr. Caraballo responded "No." (Function Report, 5). He explained that he "does not socialize anymore – his mood feels very down and not animated." (Function Report, 5). Mr. Caraballo reported feeling "social phobia," and feeling that "people are talking and laughing about him." (Function Report, 4; Perdomo Evaluation, 3).

In spite of Mr. Caraballo's description of his symptoms, the ALJ found that the medical evidence did not support a conclusion that his depression caused such severe symptoms. Rather, she found moderate restriction in

6

activities of daily living and social functioning. That finding was supported by substantial evidence:

First, Mr. Caraballo regularly visited the Department of Behavioral Health and Psychiatry at Trinitas Hospital for group therapy sessions and medication consultations. Treatment records from the hospital indicate only "mild depression" or "mild anxiety." For example, records from four different visits indicate that "patient feels on and off depressed" (Trinitas Treatment Records I, 7, 8), or "patient feels some depression" (Trinitas Treatment Records I, 11). Records from numerous visits characterize Mr. Caraballo's mood or affect as "mild depression" (Trinitas Treatment Records I, 9, 10; Trinitas Treatment Records II, 15) or "mild anxiety" (Trinitas Treatment Records I, 11; Trinitas Treatment Records II, 8-12, 15). It was reasonable for the ALJ to conclude that such records do not support a conclusion that depression was causing the symptoms that Mr. Caraballo reported. (Decision, 6).

Second, Mr. Caraballo indicated that if a job were available to him at his old company, he would return to work. "Q: If they had a job there you think you'd be able to go back to the job you had? A: Yes." (Caraballo Testimony, 7). Mr. Caraballo backed away somewhat from this testimony when his own attorney questioned him about it.

> Q: You told the Judge that if you had your job back you could go out and drive the truck tomorrow, is that correct?
>
> A: I don't know. To drive the truck I would certainly try it but I don't know.
>
> Q: Would you be able to get out of the house and get in the truck and make all your stops?
>
> A: No, no.
>
> Q: What do you mean no, no?
>
> A: No. I know that through the city I couldn't drive the truck right now.
>
> Q: And why's that?

>   A: I can't even drive my own personal car. My wife doesn't let me drive.

(Caraballo Testimony, 13-14). The ALJ, while finding only moderate impairment, agreed that Mr. Caraballo's condition rendered him unable to return to the particular job he had occupied before. (Decision, 22). She may have considered this apparent hedging as it bore on Mr. Caraballo's credibility, or treated it as a generalized acknowledgement that he could perform some kind of work.

Third, Mr. Caraballo did indicate that he is able to care for his own hygiene. Mr. Caraballo checked a box for "no problem with personal care" on a form that he filled out, and checked "no" for "Do you need any special reminders to take care of personal needs and grooming?" (Function Report, 3). *See also* Plaintiff's Brief, n. 2; Disability Reports I, II, and III (pages 4 and 3, respectively).

Fourth, Treatment Records indicate that Mr. Caraballo traveled to Puerto Rico to visit his mother, contradicting to some extent his statement that he insulates himself from others. (Trinitas Treatment Records II, 8).

Fifth, Mr. Caraballo underwent a Global Assessment of Functioning test. GAF tests are used to rate the "social, occupational, and psychological functioning" of adults. *Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 534 n. 3 (3d Cir. 2011). GAF scores range from 1-100. *Id.* The lower the score, the less functional the patient is considered to be. Records from Trinitas hospital indicate that Mr. Caraballo had a GAF score of 60, with a "highest score" of 70. (Trinitas Treatment Records I, 26). A GAF score of 61-70 indicates "some mild symptoms"; a score of 51-60 indicates "moderate symptoms." (Opp. 14, citing Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000)). The GAF test thus constitutes objective evidence that supports the ALJ's determination that the restrictions of Mr. Caraballo's social functioning and activities of daily living are real, but moderate.

Finally, the ALJ found that the Mr. Caraballo's description of his symptoms were not credible. (Decision, 7). The ALJ found that Mr. Caraballo's self-reported symptoms overstated the degree to which his depression restricted his activities of daily living and social functioning. The ALJ's basis for discounting the credibility of Mr. Caraballo's testimony was its inconsistency with the medical evidence. In particular, her determination was supported by the treatment records from Trinitas describing only mild depression, the GAF scores in the record, and (to a lesser degree) certain of Mr. Caraballo's own statements.

An ALJ is empowered to make such credibility determinations:

> Additionally, while an ALJ must consider a claimant's subjective complaints, an ALJ has discretion to evaluate the credibility of a claimant and arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant. Subjective complaints cannot alone establish disability.

*Gantt v. Comm'r Soc. Sec.*, 205 F. App'x 65, 67 (3d Cir. 2006) (internal quotations and citations omitted). *See also Davis v. Com'r of Soc. Sec.*, 240 F. App'x 957, 960 (3d Cir. 2007). And the ALJ here fulfilled her responsibility to give the claimant's testimony "serious consideration," to state her reasons for discounting it, and to make "specific findings." *Rowan v. Barnhart*, 67 F. App'x 725, 729 (3d Cir. 2003).

The ALJ's determination that such restrictions were moderate, not "marked" as required by criteria 1 and 2, was supported by substantial evidence.

2. *Criterion 3: Concentration*

Mr. Caraballo also challenges the ALJ's determination that Mr. Caraballo did not meet criterion no. 3 because he suffers only moderate, not "marked," difficulties in maintaining concentration, persistence, or pace. That decision is likewise supported by substantial evidence.

Mr. Caraballo testified before the Administrative Law Judge, who observed and commented on his demeanor. The ALJ pointed out that at the

9

hearing, the claimant was "able to answer all questions asked of him in an appropriate and timely manner, thereby demonstrating a level of concentration in the arguably stressful setting of a disability hearing." (Decision, 18).

In addition, the ALJ relied on the findings of Dr. Perdomo, a licensed psychologist who conducted a mental status examination of Mr. Caraballo for the New Jersey Division of Disability Services. Dr. Perdomo did find that Mr. Caraballo's concentration was "impaired," but the doctor found only "moderate" difficulties in concentration (Perdomo Evaluation, 3).

Dr. Perdomo did note significant evidence of impairment. Mr. Caraballo was unable to count backwards from 100 or to perform a serial 3 or a serial 7 (100 minus 3 or 100 minus 7). (Perdomo Evaluation, 3). In addition, Mr. Caraballo's short-term and long-term memory were impaired; for example, he "did not know what date, day, what month, or what year it was." (Perdomo Evaluation, 3). He could not correctly name the current President of the United States or any prior Presidents. (Perdomo Evaluation, 3). Five minutes after being furnished a list of five words, he could not recall any of them. (Perdomo Evaluation, 3). He did not know his social security number, and had difficulty relating his own background. (Perdomo Evaluation, 3).

On the other hand, Dr. Perdomo also found that Mr. Caraballo was "able to understand and follow instructions of moderate complexity, like a 4-step instruction." (Perdomo Evaluation, 2). Dr. Perdomo reported that Mr. Caraballo's "thought process was organized and focused," and that he "spoke coherently and relevantly." (Perdomo Evaluation, 3). Mr. Caraballo was able to repeat two digits forward or backward, and to recall three out of five words immediately after they were stated to him. (Perdomo Evaluation, 3). This evidence supports Perdomo's, and the ALJ's, conclusion that Mr. Caraballo's concentration was impaired, but only moderately so.

Treatment records from Trinitas Hospital likewise support the ALJ's conclusions as to concentration. Records from multiple visits over several years indicate that Mr. Caraballo's thought process was "intact." (Trinitas Treatment Records I, 6, 23); as were his general knowledge and cognitive functioning.

(Trinitas Treatment Records I, 7, 10; Trinitas Treatment Records II, 12, 13). They describe his thought process as "coherent" (Trinitas Treatment Records I, 8, 9; Trinitas Treatment Records II, 10, 12, 13, 15), and "clear" (Trinitas Treatment Records I, 9; Trinitas Treatment Records II, 14, 15). As discussed above, the same records report a GAF score of 60-70. (Trinitas Treatment Records I, 23).

The Trinitas reports are not wholly positive. One said Mr. Caraballo's "attention/concentration" were "poor." (Trinitas Treatment Records I, 24). Others indicate that his thought process was "circumstantial" and "tangential" (Trinitas Treatment Records, 12-14, 23). The ALJ did not find, however, that Mr. Caraballo's concentration and thought processes were wholly unencumbered; she found that they were impaired to a moderate degree. Substantial evidence, including the evidence indicating problems with concentration, supports that conclusion.

### 3.     Other Criteria

Criterion number 4 under paragraph B requires repeated episodes of decompensation. Mr. Caraballo does not appear to contest the ALJ's finding that he has not suffered episodes of decompensation. (Decision, 4). He makes no mention of any evidence of such episodes in his brief, and the record reflects no such episodes.

Paragraph C, as noted above, provides an alternative means of satisfying 20 C.F.R. § 404.1520(a)(4)(iii). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ briefly disposed of Paragraph C, finding that its indicia were not present. Mr. Caraballo does not appear to challenge this finding on appeal. (*See* Pl. Br. 21-25.) Nor does the record suggest that the paragraph C criteria are satisfied.[4]

---

4         Paragraph C provides that the required level of severity is met when the following criteria are satisfied:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic

In sum, the ALJ properly found that Mr. Caraballo did not meet the criteria of Appendix 1. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Substantial evidence supported her finding at Step 3 that Mr. Caraballo's impairment is not so severe as to meet or equal one of the impairments listed in the Regulations.

## B.  Residual Functional Capacity

Mr. Caraballo also challenges the ALJ's determination of Mr. Caraballo's residual functional capacity ("RFC"). The ALJ found that the claimant possessed the capacity to perform jobs that are unskilled, repetitive, and low-stress (requiring only an occasional change in the work setting and in decision-making during the workday). (Decision, 5). That finding, too, was supported by substantial evidence.

As discussed above, the ALJ cited substantial evidence that Mr. Caraballo had only moderate restrictions in activities of daily living, social functioning, and concentration. *See* Part II.A, *supra*. The treatment records for Trinitas indicated only mild anxiety, which is consistent with a finding that Mr. Caraballo can perform some types of low-stress work. *See* Trinitas Treatment

---

work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

Records I, 7, 8 ("patient feels on and off depressed"); Trinitas Treatment Records I, 11 ("patient feels some depression"); Trinitas Treatment Records I, 9-11; Trinitas Treatment Records II, 8-12, 15 (listing Mr. Caraballo's mood/affect as "mild depression" or "mild anxiety").

Mr. Caraballo points out that his treating physician diagnosed Mr. Caraballo with much more severe depression. His treating psychiatrist stated that "Mr. Caraballo continues to experience severe depression, poor concentration, poor memory, fluctuations in mood and psychosis. These symptoms interfere with his daily functioning and necessitate long term care." (Pena Opinion, 1).[5]

It is true as a general matter that the opinion of a medical source who has actually treated the patient is given greater weight. (20 C.F.R. § 416.927(c)(2)) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)." But the opinion of a treating source must be given "controlling weight" only when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2).

An ALJ may reject the opinion of a treating physician if she determines that the source's opinion is contradicted or unsupported by the medical evidence in the record:

> Here, the ALJ rejected Dr. Gansheroff's opinion of marked limitation because it contradicted his own treatment records, which indicated Becker's mental limitations as only

---

[5] Dr. Pena also concluded that Mr. Caraballo was disabled. That opinion, in the nature of a legal conclusion, does not entitle Mr. Caraballo to benefits. See 20 C.F.R. § 416.927(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability...A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled." 20 C.F.R. § 416.927(d)(1); *Gantt v. Comm'r Soc. Sec.*, 205 F. App'x 65, 66-67 (3d Cir. 2006).

13

> moderate. Likewise, the ALJ rejected Dr. Smith's interrogatory responses and conclusions regarding Becker's ability to work because they contradicted his own treatment records, which indicated that Becker had responded positively to medication and treatment and could sit, stand, walk, and lift to some degree. Dr. Smith's interrogatory responses were also contradicted by Dr. Gouda, Dr. Aguire, and even Becker herself, all of whom either documented or testified that Becker was able to ambulate and perform various light activities for periods of time without severe pain. Thus, the ALJ could properly reject parts of the opinions of Dr. Smith and Dr. Gansheroff.

*Becker v. Comm'r of Soc. Sec. Admin.*, 403 F. App'x 679, 686 (3d Cir. 2010). See also *Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) (upholding an ALJ's rejection of a treating psychiatrist's opinion where that opinion was inconsistent with the other medical evidence in the record).

Here, as discussed above, the ALJ found that other medical evidence in the record did not support a diagnosis of severe depression. Her rejection of Dr. Pena's conclusions was supported by substantial evidence.

In addition, the ALJ was entitled to discount Dr. Pena's opinion based on the quality of the explanation he provided. "[A] treating physician's opinion may be rejected on the basis of contradictory medical evidence, or may be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion." *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118-19 (3d Cir. 2012). Here, Dr. Pena's opinion contained no explanation to speak of. The doctor's one-paragraph letter simply stated conclusions. (*See* Pena Opinion, 1).

Furthermore, an ALJ may discount a physician's opinion to the extent it is based solely on the claimant's own statements and does not discuss the medical evidence. *Morris v. Barnhart*, 78 F. App'x 820, 825 (3d Cir. 2003). Here, Dr. Pena pointed to no specific evidence other than statements Mr. Caraballo may have made to him. He referred generally to Mr. Caraballo's treatment at Trinitas Hospital, but, as noted above, the Trinitas treatment records would not support Dr. Pena's opinion.

14

For some of the same reasons, the ALJ was permitted to find unpersuasive the opinion of Dr. Perdomo, an examining psychologist who diagnosed Mr. Caraballo as having "recurrent major depression, severe, with some psychotic features" and "[g]eneralized anxiety disorder." (Perdomo Evaluation, 4). That opinion, the ALJ determined, was not consistent with the medical evidence in the record.

The ALJ's assessment of Mr. Caraballo's RFC was supported by substantial evidence. To the extent the ALJ discounted certain statements of treating physicians, she articulated a sufficient basis to do so.

### C. Vocational Expert's Testimony re: Ability to Work

At Step 5, the ALJ received the testimony of a vocational expert to determine whether Mr. Caraballo could perform any jobs available in the national economy. As is customary, the ALJ presented the expert with a hypothetical question, based on her prior findings in the case. That is, she posited a person with certain restrictions on his ability to function, and asked the vocational expert whether such an individual would be able to perform jobs existing in sufficient numbers in the national economy.

Specifically, the ALJ posited a person of Mr. Caraballo's age, educational history, and work history. She posited that this hypothetical person possessed abilities in accordance with her finding of Mr. Caraballo's RFC: *i.e.,* that he

> could only perform work that's simple and unskilled, work that's low-stress, that is the jobs require only an occasional change of work setting during the day, only occasional change in decision making required during the work day. And if production based production is monitored at the end of the day as opposed to consistently throughout it. The person can have no work in close proximity to others in order to avoid distraction. And by close proximity I mean any closer than three to five feet. The person can have only occasional contact with supervisors and coworkers but no contact with the general public."

(Vocational Expert Testimony, 4).

15

The vocational expert testified that such an individual could find work as a sealing machine operator, a weigher, or a sorter. (Vocational Expert Testimony, 5). He testified that more than 25,000 such jobs exist in the national economy, and that approximately 1,100 such jobs exist in the "Northern New Jersey/Metro New York" area. (*Id.*, 5). Based on this testimony, the ALJ found that there were jobs in the national economy that Mr. Caraballo could perform. (Decision, 9).[6]

Mr. Caraballo attacks, not the vocational expert's conclusions as such, but the hypothetical question on which they were based. The hypothetical person constructed by the ALJ, he says, does not represent Mr. Caraballo's true condition. (Plaintiffs' Brief, 31). However, the hypothetical that the ALJ posed is consistent with the RFC that the ALJ had already found. (*See* Decision, 5) The attack on the vocational expert's conclusions is largely a rehash of the attack on the ALJ's finding as to Mr. Caraballo's RFC. For the reasons expressed above, I rejected that challenge, finding the ALJ's finding to be supported by substantial evidence. (*See* Part II.B, *supra.*) The challenge to the vocational expert's conclusions must be rejected for similar reasons.

### D. Vagueness of ALJ's Statement of Medical Condition

Finally, Mr. Caraballo argues that the ALJ was too vague in her characterization of Mr. Caraballo's condition. The ALJ stated that Mr. Caraballo suffered from "affective disorders." (Decision, 3). The regulations define an "affective disorder" as one "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to

---

6   As is customary, the ALJ also posed to the Vocational Expert additional hypothetical individuals with more severe restrictions than she had found with respect to Mr. Caraballo. For example, the ALJ posited an individual with severe depression, poor concentration, and poor memory, or an individual who would need to miss work two times per month. The vocational expert testified that such an individual would not be able to find work existing in the national economy. Because the ALJ's assessment of Mr. Caraballo's abilities was supported by substantial evidence, the expert's answers with respect to these hypotheticals are not relevant to this appeal.

a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. Mr. Caraballo correctly points out that the ALJ's decision does not, for example, examine the Paragraph A criteria, which list specific symptoms of an affective disorder. (*See* Plaintiff's Brief, 24). To be eligible for benefits, though, a claimant must meet both the Paragraph A criteria and the Paragraph B criteria. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04; *see also* pp. 4-5, *supra*. Because the ALJ's decision that Mr. Caraballo did not meet the Paragraph B criteria was supported by substantial evidence, Mr. Caraballo would not be eligible for benefits, even if he did satisfy the Paragraph A criteria.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner will be affirmed. A separate order will issue.

February 3, 2015
Newark, NJ

_____
KEVIN MCNULTY
United States District Judge